**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

ISAIAH HUMPHRIES,

           Plaintiff,

      v.

THE PENNSYLVANIA STATE
UNIVERSITY; JAMES FRANKLIN;
and DAMION BARBER,

           Defendants.

No. 4:20-CV-00064

(Chief Judge Brann)

**MEMORANDUM OPINION**

**SEPTEMBER 24, 2021**

In January 2020, former Pennsylvania State University football player Isaiah Humphries sued the University, its head football coach James Franklin, and his former teammate Damion Barber. His headline-generating complaint alleged that while a member of the University's football team, he was subjected to physical, emotional, and sexual abuse by four of his teammates—to which the school and its football coach turned a blind eye. But for whatever his complaint possessed in attention-grabbing details, it lacked in substance.

Since Humphries' initial filing, this Court has provided him three opportunities to refashion his complaint—most recently after a motion to dismiss filed by all three Defendants. I granted that motion to dismiss in part but provided Humphries leave to amend. I largely allowed his claims against Barber, one of his

alleged abusers, to advance; but that was not the case for his claims against the University and Franklin.  On these claims, my instructions were clear:  cite legal authority showing that the University and Franklin can be held responsible for the acts of the players; and specify who committed the abuse, when it occurred, what was reported to the University employees, when that report was made, and how those employees responded.

Despite numbering 105 pages, Humphries' fourth complaint does little better than his third.  Rather than delineating a timeline or clearly outlining his legal theories, his latest complaint is rife with vestigial references to arguments and documents that this Court has told him do not matter.  Penn State and Franklin have now moved to dismiss the remaining counts against them under Federal Rule of Procedure 12(b)(6).

I find that Humphries has failed to state a claim upon which relief can be granted against Penn State and Franklin and grant their motion to dismiss Count I, Count II, Count IV, Count V, and Count VIII with prejudice.

## I.    FACTS ALLEGED IN THE COMPLAINT

I will begin by summarizing the facts, which I must accept as true in this motion.  Given the complaint's length, I highlight only the most salient to Humphries' claims against Penn State and Franklin under Title IX, common law negligence, negligence *per se*, and negligent infliction of emotional distress.

Isaiah Humphries arrived at Penn State University in January 2018, fresh off an award-winning Texas high school career.[1]  As a prep star, the 6-foot, 195-pound safety was highly recruited and received scholarship offers from some thirty-odd schools.[2]  Penn State entered the sweepstakes during Humphries sophomore year, with Head Coach James Franklin offering Humphries a full athletic scholarship in February 2016.[3]  The near two years that followed featured the pageantry now attendant to big-time college football recruiting.  Humphries traveled north several times to visit the campus, speak with coaches, and attend recruiting events.[4]  And Franklin and his staff reciprocated:  making the journey to Texas once to take in one of Humphries' high school games from the bleachers; and again, just over a month later, to visit him at his home.[5]

Throughout this recruiting odyssey, Franklin and his staff emphasized that attending Penn State would allow Humphries to maximize his athletic and academic potential and that the football coaches would "protect him", keep him safe, and treat him like a son.[6]  Ultimately, Franklin and his staff's efforts bore fruit.  After two years of courtship, Humphries accepted Penn State's offer on December 20, 2017

---

[1]    Doc. 58 at ¶ 90.
[2]    *Id.* at ¶ 91.
[3]    *Id.* at ¶ 95.
[4]    *Id.* at ¶¶ 98–99 & 101.
[5]    *Id.* at ¶¶ 102 & 107–108.
[6]    *Id.* at ¶¶ 97, 101 & 107.

and arrived on campus just a few weeks later for the start of spring practice—again, to Franklin's promises of a family-like atmosphere.[7]

But not long after Humphries arrival, the marriage soured.  In his complaint, Humphries alleges that his ten-month stint at Penn State was marred by a campaign of harassment and hazing by four fellow members of the Penn State football team.[8] Humphries' recounting of three specific events and a course of habitual conduct names four player-perpetrators:  (1) Damion Barber and (2) Yetur Gross-Matos, defensive linemen who enrolled in the Fall of 2017; and (3) Micah Parsons and (4) Jesse Luketa, linebackers and—like Humphries—winter 2018 enrollees.[9]   In this suit, Humphries names only one, Damion Barber, as a Defendant.

These players' campaign included verbal harassment:  Humphries recounts the players telling him and teammates "I am going to fuck you"; and that they planned to make them "their bitch because this is prison . . . ."[10]  He also recalls the players' shocking allusions to sexual abuse committed by former Penn State football coach, Jerry Sandusky—with the players telling him "I am going to Sandusky you" and "this is Jerry . . . ."[11]

---

[7]    *Id.* at ¶¶ 111, 115–116.
[8]    *Id.* at ¶ 143.
[9]    *Id.* at ¶¶ 125 & 127.
[10]   *Id.* at ¶¶ 121 & 123.
[11]   *Id.* at ¶¶ 146–150.

But as Humphries tells it, the players didn't stop at verbal threats. Some actions he details are childish but benign. For instance, Humphries alleges that the Barber, Gross-Matos, Parsons, and Luketa would take players' clothing and not return them.[12]

The players' other alleged actions, however, are far more troubling. In his complaint, Humphries describes how he and other players were wrestled to the ground by a member of the foursome and sexually harassed while restrained.[13] Sometimes, the offending player would simulate a "humping action" while on top of the player.[14] Other times, a member of the foursome would "place" or "smack" his genitals on the victim's face.[15] Humphries also recounts how Barber, Gross-Matos, Parsons, and Luketa would place their penises on the pinned player's buttocks or face and "stroke [their] genitalia simulating the action of ejaculation."[16] This harassment also extended into the locker room showers. There, Barber, Gross-Matos, Parsons, and Luketa would put "their penises between the cheeks of the [victim's] buttocks" and on other parts of Humphries and other players' bodies.[17]

Although Humphries describes these acts in graphic detail, in other key aspects his descriptions are wanting. He flatly alleges that two- to three-times per

---

12    *Id.* at ¶ 151.
13    *Id.* at ¶¶ 152–156.
14    *Id.* at ¶ 152.
15    *Id.* at ¶¶ 153–154.
16    *Id.* at ¶¶ 155–156.
17    *Id.* at ¶¶ 157–158.

week on average, the four players "subjected [him] to the aforementioned hazing and harassment . . . ."[18] But he fails to describe which of the four players committed specific acts, distinguish whether he was subject to persistent sexual violence two- to three-times per week or merely the theft of clothing, or detail which acts he reported to the coaching staff.

In his latest complaint, Humphries adds some detail, identifying three dates when he was hazed and harassed by particular players; but even so, his lack of specificity persists.[19] He still does not allege what conduct occurred.  For instance:

- On February 18, he claims that Yetur Gross-Matos "victimized" him "with the aforementioned hazing and harassment" in another student-athlete's Beaver Hall dorm room.[20]

- On March 26, he alleges that Micah Parsons harassed him at the Morgan Academic Center—again, without identifying which type of verbal and physical conduct occurred.[21]  Later in his pleading, Humphries details a fight that occurred that day after Parsons threw a pail of water on Humphries while he was napping in an academic building; from there, things escalated, with

---

[18]   *Id.* at ¶ 160.
[19]   *Id.* at ¶¶ 162–167.
[20]   *Id.* at ¶ 162.
[21]   *Id.* at ¶ 163.

Humphries pulling a knife on Parsons to escape a choke-hold.[22]  This series of events notably diverges from his general allegation of sexual violence—appearing to be a purely physical.[23]

- And, finally, on June 14, he says that Damion Barber and Jesse Luketa also "victimized" him "with the aforementioned hazing and harassment" in the Lasch football building locker room.[24]  Here, again, details inserted later in the pleading seem to suggest that on this occasion Barber threatened to "'fuck' the plaintiff 'in the ass'" and "attempted to fondle his genitalia"; but the complaint is silent on Luketa's conduct that day.[25]

In making these particular allegations, Humphries also begins to detail his reports to the coaching staff.  He first reports seeking help from the coaching staff after the Parsons water pail incident in March; that evening, he reported the incident to Coach Franklin.[26]  But in conversations with Humphries and his father in the days

---

22   *Id.* at ¶¶ 179(2)–183(2).   Due to misnumbering in Humphries' complaint, some paragraphs are repeated.  I use a "(2)" when I refer to the second paragraph with that number.

23   *See id.* ¶¶ 146–149 & 152–159 (detailing verbal and physical sexual harassment and abuse).  The purely physical general allegations are fare more limited; I count just two. *Id.* ¶ 150 ("[T]he hazing and harassment undertaken by Defendant Damion Barber, Micah Parsons, Yetur Gross-Matos, and Jesse Luketa included intimidating, threatening and bullying selected members of the Penn State football team.") and *id.* ¶ 151 ("[T]he hazing and harassment undertaken by defendant Damion Barber, Micah Parsons, Yetur Gross-Matos, and Jesse Luketa included taking the clothes of selected members of the Penn State football team, such as the plaintiff, and not returning them.").

24   *Id.* at ¶ 166.

25   *Id.* at ¶ 177.

26   *Id.* at ¶ 184.

that followed, Franklin chastised Humphries for having pulled a knife and told him that he should have just "gotten [his] ass beat."[27]  Franklin ultimately punished both Parsons and Humphries—with Humphries being given extra early morning workouts while Parsons was placed on conduct probation through the end of the fall semester.[28]

   After this report, Humphries alleges that the four players retaliated and continued to haze and harass him to get him to quit.[29]  In turn, Humphries' outreach to coaches picked up—but, in his view, to little avail.  A few weeks after the Parsons altercation, Humphries recounts telling an assistant coach, Timothy Banks, that he was being harassed; Banks, however, responded by telling him to come to practice the next day without the drama.[30]  A few days later, Humphries' father called Banks to discuss his son's mistreatment; this time, Banks allegedly responded by saying that Humphries "needed to stop acting as if he was affluent, refined, and sophisticated."[31]  And, in late May, Humphries' father would again call Banks, this time about a physical threat made by Luketa.[32]

---

[27]   *Id.* at ¶¶ 186–191.
[28]   *Id.* at ¶¶ 162–167.
[29]   *Id.* at ¶¶ 194–196.
[30]   *Id.* at ¶ 172.
[31]   *Id.* at ¶ 174.
[32]   *Id.* at ¶ 175.

Humphries' June incident involving Barber and Luketa generated one final flurry of reports.[33]  In the week that followed, Humphries and his father again spoke to Franklin and various members of his staff about the four players' continuing harassment—particularly Barber's attempt to fondle Humphries in the locker room.[34]  But in Humphries' telling, Franklin and his staff took no action to protect him.[35]  To the contrary, Humphries alleges that his coaches retaliated against him for making the reports by unfairly evaluating his performance, "scorning" him, denying him playing time, pitting him against teammates in drills in a way that was designed to ensure his failure, having the team's academic advisor "censure him", not allowing him a medical accommodation for anxiety and narcolepsy, and pushing him to medically retire.[36]

Looking back, Humphries contends that these players' hazing and harassment was a part of his initiation onto the team, retaliation for his fight with Parsons, and punishment for not living up to the standard of "toughness and masculinity expected of a collegiate football player."[37]  In doing so, Humphries highlights traits that he argues led to his teammates' ire and coaches' neglect.

---

[33]   *Id.* at ¶¶ 177–176(2).
[34]   *Id.* at ¶¶ 177–180.
[35]   *Id.* at ¶ 187.
[36]   *Id.*
[37]   *Id.* at ¶¶ 144–145, 194–196.

He notes that, unlike the model Penn State football player and his four teammates:

- He is an accomplished musician, skilled in the guitar, piano, and ukulele.[38]

- He speaks "English with diction that provided clarity and a distinctiveness of pronunciation of speech" and doesn't use vulgarity.[39]

- He has a "well-groomed and refined appearance," dresses in a "sophisticated style", and presents with "an appearance and mannerism of affluence . . . ."[40]

- He was raised to be compassionate, sensitive, and kind and not resolve conflicts through violence.[41]

- And he does "not embrace the angry gangster or thug persona."[42]

Regardless of the cause, by August 2018 it became clear that the hazing and harassment had taken its toll:  Humphries reports having become anxious, sleepless, and depressed—an assistant coach even called Humphries' father because he was concerned that Humphries was suicidal.[43]  In late November, after a season where Humphries did not receive any playing time, they separated, with Humphries announcing his transfer and leaving Penn State.  But even their separation was not amicable:  Humphries alleges that the staff spoke poorly of him to other football

---

[38]   *Id.* at ¶ 128.
[39]   *Id.* at ¶¶ 129–130.
[40]   *Id.* at ¶¶ 131–133.
[41]   *Id.* at ¶¶ 134–137.
[42]   *Id.* at ¶ 138.
[43]   *Id.* at ¶¶ 176(2) & 227.

coaches on his way out the door.[44]  By January, however, the divorce was finalized; and Humphries moved on to the University of California, Berkeley.[45]

## II.    LEGAL STANDARD

Before I move on to the merit of the claims that Humphries and Penn State's rocky marriage and messy divorce produced, I will first review the relevant legal standard.  Under Federal Rule of Civil Procedure 12(b)(6), the Court dismisses a complaint, in whole or in part, if the plaintiff has failed to "state a claim upon which relief can be granted."  A motion to dismiss "tests the legal sufficiency of a claim"[46] and "streamlines litigation by dispensing with needless discovery and factfinding."[47] "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."[48]  This is true of any claim "without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one."[49]

Following the Roberts Court's "civil procedure revival,"[50] the landmark decisions of *Bell Atlantic Corp. v. Twombly*[51] and *Ashcroft v. Iqbal*[52] tightened the

---

[44]   *Id.* at ¶ 180
[45]   *Id.* at ¶ 177(2).
[46]   *Richardson v. Bledsoe*, 829 F.3d 273, 289 n.13 (3d Cir. 2016) (Smith, C.J.) (citing *Szabo v. Bridgeport Mach., Inc.,* 249 F.3d 672, 675 (7th Cir. 2001) (Easterbrook, J.)).
[47]   *Neitzke v. Williams,* 490 U.S. 319, 326–27 (1989).
[48]   *Id.* at 326 (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984)).
[49]   *Id.* at 327.
[50]   Howard M. Wasserman, *The Roberts Court and the Civil Procedure Revival,* 31 Rev. Litig. 313, 316, 319–20 (2012).
[51]   550 U.S. 544 (2007).
[52]   556 U.S. 662 (2009).

standard that district courts must apply to 12(b)(6) motions.[53]  These cases "retired" the lenient "no-set-of-facts test" set forth in *Conley v. Gibson* and replaced it with a more exacting "plausibility" standard.[54]

Accordingly, after *Twombly* and *Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[55]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[56]  "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."[57]  Moreover, "[a]sking for plausible grounds . . . calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [wrongdoing]."[58]

The plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[59]  No matter the context, however, "[w]here a complaint pleads facts that are 'merely consistent

---

[53]   *Id.* at 670 (citing *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957))
[54]   *Id.*
[55]   *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).
[56]   *Id.*
[57]   *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (Jordan, J.) (internal quotation marks and citations omitted).
[58]   *Twombly*, 550 U.S. at 556.
[59]   *Iqbal*, 556 U.S. at 679.

- 12 -

with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"[60]

When disposing of a motion to dismiss, the Court "accept[s] as true all factual allegations in the complaint and draw[s] all inferences from the facts alleged in the light most favorable to [the plaintiff]."[61]   However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions."[62]  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[63]

As a matter of procedure, the United States Court of Appeals for the Third Circuit has instructed that:

> Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps. First, it must take note of the elements the plaintiff must plead to state a claim. Second, it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.[64]

---

[60]   *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557).

[61]   *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (Nygaard, J.).

[62]   *Iqbal*, 556 U.S. at 678; *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (Nygaard, J.) ("After *Iqbal*, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss.").

[63]   *Iqbal*, 556 U.S. at 678.

[64]   *Connelly*, 809 F.3d at 787 (internal quotations and citations omitted).

## III.   DISCUSSION

### A.   Humphries fails to state a claim for Common Law Negligence and Negligence *Per Se*

Under Rule 12(b)(6)'s standard, this Court first considers whether Humphries has sufficiently pled a claim of common law negligence and negligence *per se* against Penn State and Franklin.  Negligence's requirements are well-trodden:  "To establish a prima facie case of negligence, a plaintiff must plead that 'the defendant owed a duty of care to the plaintiff, the defendant breached that duty, the breach resulted in injury to the plaintiff, and the plaintiff suffered an actual loss or damage.'"[65]

Penn State and Franklin's first line of attack is that neither party owed a legal duty to protect Humphries.  While "each person may be said to have a relationship with the world at large that creates a duty to act where his own conduct places others in peril, Anglo-American common law has for centuries accepted the fundamental premise that mere knowledge of a dangerous situation, even by one who has the ability to intervene, is not sufficient to create a duty to act."[66]  Thus, the general rule under Pennsylvania law is that parties ordinarily owe "no duty to control the conduct of a third party to protect another . . . ."[67]

---

[65]   *Walters v. UPMC Presbyterian Shadyside*, 187 A.3d 214, 221 (Pa. 2018) (quoting *Martin v. Evans*, 711 A.2d 458, 461 (Pa. 1998)).

[66]   *Wenrick v. Schloemann-Siemag Aktiengesellschaft*, 564 A.2d 1244, 1248 (Pa. 1989).

[67]   *Emerich v. Philadelphia Ctr. for Hum. Dev.*, 720 A.2d 1032, 1036 (Pa. 1998).

But this general rule is not without exceptions.   In reply, Humphries sets forth

five theories that he says show that Penn State and Franklin owed a duty to protect

him under existing law:

- First, that Penn State and Franklin have created a duty through their
  contractual relationship.[68]

- Second, that the University assumed a duty through their administrative
  policies and disciplinary decisions.[69]

- Third, that Pennsylvania law recognizes a duty-creating special relationship
  between athletes and their schools.[70]

- Fourth, that University owed a duty as a possessor of land.[71]

- And, fifth, that he was owed a statutory duty under the Timothy J. Piazza
  Antihazing Law.[72]

Whether the Defendants owed Humphries a duty under any of these theories is a

question of law that this Court can resolve on a motion to dismiss.[73]

In assessing these state law claims, I am mindful that the "disposition of this

case must be governed by a prediction of what a [Pennsylvania] court would do if

---

[68]   Doc. 72-1 at 21–22.
[69]   *Id.* at 22–24.
[70]   *Id.* at 25–29.
[71]   *Id.* at 29–31.
[72]   *Id.* at 16–21.
[73]   *Perez v. Great Wolf Lodge of the Poconos, LLC*, 200 F. Supp. 3d 471, 478 (M.D. Pa. 2016).

confronted with the facts before us."[74]  And I heed the Pennsylvania Supreme Court's instruction that because "negligence evolves through either directly applicable decisional law or by analogy, . . . a defendant is not categorically exempt from liability simply because appellate decisional law has not specifically addressed a theory of liability in a particular context."[75]  Just as "[a] diversity litigant should not be drawn to the federal forum by the prospect of a more favorable outcome than he could expect in the state courts. . . . [,] neither should he be penalized for his choice of the federal court by being deprived of the flexibility that a state court could reasonably be expected to show."[76]

### 1.      The Contractual Duty of Care

Turning now to Humphries' first theory:  Penn State and Franklin owed a duty to protect him from his teammates because of promises that Franklin made to him during his recruitment and ten-month stint on the team.[77]  This argument recycles a claim that I rejected in the last go-around.[78]  This time, Humphries alters the basis ever so slightly—adding that Franklin promised to protect him as if he "was a 'son'

---

[74]   *Becker v. Interstate Properties*, 569 F.2d 1203, 1205 (3d Cir. 1977).
[75]   *Scampone v. Highland Park Care Ctr., LLC*, 57 A.3d 582, 599 (Pa. 2012).
[76]   *Becker*, 569 F.2d at 1206.
[77]   Doc. 72-1 at 21–22.
[78]   Doc. 56 at 19 (reported as *Humphries v. Pennsylvania State Univ.*, 492 F. Supp. 3d 393, 407 (M.D. Pa. 2020)).

or a 'family member'"[79]—but otherwise resorts to the same grounds alleged in his second complaint.[80]

Put plainly:  I didn't reject this argument in the last complaint for want of promises; I rejected the argument because Humphries failed to provide a single legal basis to impose a tort duty because of a party's promises.[81]  And in his latest pleading, Humphries again cites no law.[82]

While he does not delve into the details, Humphries' claim straddles the fault between contract and tort law.  Rather than allowing these areas of law to meld together, courts have sought to maintain this rocky (and often unclear) divide over the last century.  And in doing so, they have developed a doctrine to deal with claims like Humphries': the gist of the action doctrine.  Pennsylvania courts have employed this doctrine to deal with Trojan Horse torts—that is, instances when plaintiffs have clothed a breach of contract claim in negligence terms so they can recover noneconomic damages (like pain and suffering) that they could not recover under contract law.[83]  Under this doctrine, if:

> [T]he duty breached is one created by the parties by the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. . . .  If, however, the facts establish that the claim involves the

---

[79]     Doc. 58 at ¶¶ 279 & 300.
[80]     Doc. 72-1 at 21; *Humphries*, 492 F. Supp. 3d at 407.
[81]     *Id.*
[82]     Doc. 72-1 at 21-22.
[83]     *See Bruno v. Erie Ins. Co.*, 106 A.3d 48, 64–66 (Pa. 2014).

> defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of contract, then it must be regarded as a tort.[84]

In short, having a contract won't stymie a plaintiff's tort claim—but the duty that the defendant breached must exist independent of the contract. If that duty doesn't exist independently, the tort claim must be dismissed.[85]  Because of this posture, defendants have historically deployed the doctrine offensively—arguing that the alleged breach of a duty stemmed from the parties' contractual relationship, which would limit the plaintiff to a recovery on the contract, rather than in tort.[86]

Perplexingly, Humphries implicates the doctrine here—explicitly invoking the language of contract law in his papers.  His latest complaint alleges that Penn State and Franklin's breach "was in failing to deliver on their promises to protect [him] as if he was a 'son' or 'family'."[87]  While his reply brief parrots the language of promissory estoppel, arguing that his complaint shows how he "relied on" Penn State and Franklin's promise "to his detriment."[88]  Putting aside any questions about whether Penn State and Franklin's promises to maximize Humphries' potential and "protect him like a son" are enforceable (which I doubt), Humphries has stumbled into what most plaintiffs carefully tip-toe around:  the gist of the action doctrine.

---

84    *Id.* at 68.
85    *Id.* at 60.
86    *See id.* at 61–67.
87    Doc 58. at ¶ 300; *see also id.* at ¶ 279.
88    Doc. 72-1 at 22.

Because "the duty breached is one created by the parties by the terms of their contract . . . the claim is to be viewed as one for breach of contract"—not negligence.[89]

Far from creating a duty under negligence law, Humphries' promise-based theory makes the case for its own dismissal. This Court obliges.

### 2. Assumption of Duty

Humphries next argues that Penn State and Franklin assumed a duty to protect him.[90] He cites three supposed duty-creators: Penn State's decision to place Micah Parsons on conduct probation,[91] its requirement that students adhere to a code of conduct and set of administrative policies,[92] and its same requirement for staff.[93] I rejected a similar argument in the last motion to dismiss, holding that adopting conduct policies did not mean that the University or its football coach had assumed a duty to protect Humphries from violators—or violations—of those policies.[94]

To try to wriggle free from this holding, Humphries refashions his argument in his latest complaint in a few ways. First, he points to the Restatement (Second) of Torts § 323 (1965) as a basis for his assumption of duty claim—his previous

---

[89]   *Bruno*, 106 A.3d at 68.
[90]   Doc. 72-1 at 22.
[91]   Doc. 58 at ¶¶ 179(2)–193 & 281.
[92]   *Id.* at ¶¶ 260–261.
[93]   *Id.* at ¶¶ 262–277.
[94]   *Humphries*, 492 F. Supp. 3d at 407.

complaint, in contrast, cited no authority.[95]   Second, he asserts the University's placement of Parsons on conduct probation as a new ground for the University's assumption of a duty.[96]   And, third, he argues that rather than the University assuming a duty to protect students from violations of its policies based on a special relationship between the University and its students (the argument I rejected last time), that duty instead arises from an employer-employee-created special relationship.   In other words, that by enacting policies that its employees had to follow, the University assumed new duties.[97]   None of these revisions change the result.

### a.   Humphries' Revised Argument Under Section 323 and the Addition of Parsons' Probation

Humphries' first two revisions are intertwined; so, I will consider them in tandem, beginning with the first, which tethers his claim that Penn State and Franklin assumed a duty through their affirmative conduct to a restatement provision, before moving on to see how this provision applies to his second revision—Parsons' probation.[98]

Humphries starts by arguing that "Pennsylvania courts have adopted the Restatement (Second) of Torts § 323 (1965), as the law of Pennsylvania"[99] and that

---

[95]   Doc. 58. at ¶ 281; *see* Doc. 50-1 at 39–40.
[96]   Doc. 58 at ¶ 281; Doc. 72-1 at 22.  *See also* Doc. 58 at ¶¶ 179(2)-193.
[97]   Doc. 72-1 at 23–24.
[98]   *Id.* at 22, 24.
[99]   *Id.* at 22.

within this restatement provision's framework, his amended complaint "permits the reasonable inference [that] the Penn State Defendants' affirmative conduct gave rise to an assumed duty of care . . . to protect the plaintiff from abusive behavior."[100]

The broader framing of the question is correct:  whether Penn State and Franklin owed a duty to protect Humphries based on their affirmative conduct implicates section 323.[101]   This restatement provision—known as the "Good Samaritan exception"[102]—evades Pennsylvania's general rule that there is no duty to protect against harm by third parties.[103]   The codified text lays out the consequences for those who negligently come to the aid of another:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm; or
> (b) the harm is suffered because of the other's reliance upon the undertaking.[104]

Humphries appears to argue that he falls under part (b), claiming that:  (1) Penn State and Franklin "render[ed] services to [him]" by passing (and promising to

---

[100]   *Id.* at 24.

[101]   *See Feld v. Merriam*, 485 A.2d 742, 746 (Pa. 1984) (noting that Section 323 is an accurate statement of law in the Commonwealth).

[102]   *Turbe v. Gov't of Virgin Is.*, 938 F.2d 427, 430 (3d Cir. 1991).

[103]   *Jean v. Bucknell Univ.*, 2021 WL 1516467, at *6 (M.D. Pa. Apr. 16, 2021).

[104]   Restatement (Second) of Torts § 323; *Feleccia v. Lackawanna Coll.*, 215 A.3d 3, 14 (Pa. 2019).

enforce) student and staff conduct policies and placing Parsons on probation; (2) the Defendants should have known these services were "necessary" for his protection; (3) he relied on these services; and (4) he was harmed by the Defendants' negligence in carrying those services out.[105]

But Humphries' cursory framing fails to deal with two nuances.  First off, Pennsylvania takes a cabined approach to this restatement provision, as this Court noted in a recent on-campus hazing case:

> Pennsylvania courts' treatment of section 323 can be described as "restrictive."  Promisees "may not expect more than is offered," meaning that they may only recover from a party who negligently performs a promise, not one who makes a promise that is wholly inadequate.  Further, courts have found parties liable under section 323 only where they have engaged in a specific undertaking, as opposed to a general promise.  For example, a landlord's offer to replace a broken lock constitutes a specific undertaking, but a general promise to provide security on the premises does not.[106]

And, on a second, related note, "previous courts have found that simply enacting policies does not create new duties for entities."[107]  In rejecting college-policy based claims, these courts emphasized the law's retreat from the *in loco parentis* standard as college students won greater privacy and autonomy—and declined to create a duty that would effectively reimpose a standard at odds with societal conditions.[108]

---

[105]   *See* Doc. 58 at ¶¶ 179(2)–193(2), 281; Doc. 72-1 at 22.

[106]   *Jean*, 2021 WL 1516467, at *7.

[107]   *Humphries*, 492 F. Supp. 3d at 407.

[108]   *See, e.g., Alumni Ass'n v. Sullivan*, 572 A.2d 1209 (Pa. 1990); *Fitzpatrick v. Universal Tech. Inst., Inc.*, 2009 WL 2476639 (E.D. Pa. Aug. 13, 2009); *Booker v. Lehigh Univ.*, 800 F. Supp. 234 (E.D. Pa. 1992); *Millard v. Osborne*, 611 A.2d 715 (Pa. Super. 1992).

Against this backdrop, the flaws in Humphries' section 323 claims surface. First, his claim that Penn State and Franklin "undertook a duty to control football players . . . to conform their behavior to the Student Code of Conduct and Administrative Policies" is nothing more than a policy-based claim that this Court, and other courts, have rejected.[109]

Even if you set aside the college cases, the claim does no better.  Section 323 requires a specific undertaking.[110]  The policies that Humphries invokes—read generously—only provide a general promise of protection.  (A less generous reading:  these hazing, harassment, and gender-based discrimination banning policies provide no general promise of protection at all—only a promise of consequences for transgressors.)

Humphries' second claim—and second revision—that Penn State and Franklin assumed a duty by placing Parsons on probation suffers similar defects. Humphries alleges that after the water pail-instigated fight, Penn State and Franklin "plac[ed] Micah Parsons on conduct probation for the purpose of protecting the plaintiff from [Parsons'] further hazing, abuse, and harassment . . . ."[111]  Even if this Court accepts Humphries' rather conclusory allegation that Parsons' probation was

---

[109]   Doc. 72-1 at 22; *see Humphries*, 492 F. Supp. 3d at 407 (finding that the code of conduct and school administrative policies did not impose an assumed duty of care on the defendants).

[110]   *Jean*, 2021 WL 1516467, at *6; Doc 58 at ¶¶ 30-50 & 51–67, 260(2)–261(2).

[111]   Doc. 58. at ¶ 193.

intended for his protection—and could thus be seen as the University guaranteeing his protection—its logical extension short-circuits.  Each time that a college put a student on probation, it would become "an insurer of the safety of its students."[112] That's unacceptable.  Pennsylvania law on this count is clear:  colleges are no longer subject to an *in loco parentis* standard; and section 323 warrants a "restrictive approach . . . ."[113]  Humphries has provided no grounds for us to predict that the Pennsylvania Supreme Court would depart from those approaches in this case.

### b.    Humphries' Employer-Employee Spin

Humphries' third special relationship revision in his latest complaint recasts his argument that Penn State and Franklin assumed a duty through their enactment and enforcement of school policies.[114]  His previous complaint traversed the ground that I just covered, arguing that because the school had a policy it owed a duty to protect students from violators and violations of that policy.[115]  His most recent complaint adds another link to the chain.  Humphries now invokes the employer-employee special relationship, claiming that because school employees under Penn State and Franklin's control had to enforce hazing- and harassment-prohibiting

---

[112]   *Bradshaw v. Rawlings*, 612 F.2d 135, 138 (3d Cir. 1979).
[113]   *James v. Duquesne Univ.*, 936 F. Supp. 2d 618, 639 (W.D. Pa. 2013).
[114]   Doc. 72-1 at 24.
[115]   Doc. 50-1 at 39–40.

school policies, Penn State and Franklin can be held liable if those employees fail to prevent hazing and harassment.[116]

In service of this employer-employee special relationship argument, Humphries points the Court to two cases and § 317 of the Restatement (Second) of Torts. It is true, as Humphries argues, that in "*some* cases" an employer-employee relationship is sufficiently "special" to warrant imposing a duty on the employer to prevent its employee from creating "an unreasonable risk of bodily harm" to third parties.[117] But the facts that Humphries alleges make it clear that this is not one of those cases.

The first duty-creating case that Humphries likens his own to is *Walters v. UPMC Presbyterian Shadyside*.[118] There, the Pennsylvania Supreme Court considered a negligence claim against a UPMC hospital whose former employee had gone on to infect several people with Hepatitis C while employed elsewhere.[119] During his employment at various hospitals, the employee had satisfied a drug habit by injecting himself with hospital pain killers.[120] He tried to hide his habit by refilling the used syringe with saline and putting it back, but in the process, he ended up passing along hepatitis when the needle was used later.[121] The UPMC hospital

---

[116]   *Id.*
[117]   *Id.* (emphasis added); Restatement (Second) of Torts § 317.
[118]   187 A.3d 214 (Pa. 2018).
[119]   *Id.* at 219–21.
[120]   *Id.*
[121]   *Id.*

caught him in the act, fired him, and reported the incident to the state attorney general's office; but they did not report him to the United States Drug Enforcement Agency, as federal law required.[122]  Even after being fired, the employee managed to land jobs at other hospitals, where he carried on his secretive narcotics use—eventually infecting the plaintiff.[123]

The Pennsylvania Supreme Court wrestled over whether the hospital owed the plaintiff a duty to control the unauthorized actions of their former employee by making the federally required report.[124]  And while that court ultimately determined that the hospital owed a duty, it did so despite its "reservations" about whether the ex-employee and the hospital "truly had a special relationship."[125]  It just so happened that other considerations tipped the scales in favor of applying a limited duty to report:  the federal government had expressed a commitment to controlling powerful drugs and identifying individuals who moved them illegally; the hospital's failure to report led to significant harms; and the duty could be satisfied by an act that the hospital was already required to take.[126]

Put simply:  there's a big difference between imposing a duty to protect third parties by making a legally required report when a hospital employee steals narcotics

---

[122]   *Id.* at 219–21, 230.
[123]   *Id.* at 219–21.
[124]   *Id.* at 232–35.
[125]   *Id.* at 240–42.
[126]   *Id.*

(and, in the process, exposes patients to blood-borne diseases) and imposing a duty on a university to ensure that its employees prevent students from being harmed by violations of the school's code of conduct and administrative policies. So *Walters* does nothing for Humphries here.

The same is true of the other case that Humphries cites: *R.W. v. Manzek*.[127] There, the Pennsylvania Supreme Court considered a negligence claim stemming from a ten-year-old child's brutal rape and beating.[128] The child had entered the home of the perpetrator while trying to make a candy sale for a school fundraiser.[129] After this heinous crime, the child's parents sued the companies that ran the fundraiser, alleging that they had a duty to warn the children, but that instead the companies—through an employee—had encouraged the children to go out and make sales without telling them about possible dangers.[130] The court ultimately found that there was a duty because the companies had a sent a representative to recruit the children—enticing them with prizes and classroom parties—and because the risk of an attack was a "foreseeable consequence of encouraging children to sell goods to strangers."[131]

---

[127]   888 A.2d 740 (Pa. 2005).
[128]   *Id.* at 741–42.
[129]   *Id.* at 742–44.
[130]   *Id.*
[131]   *Id.* at 747 & 752.

This Court, however, fails to see how this case supports Humphries' argument that Penn State and Franklin assumed duty to protect Humphries through an employer-employee relationship. In *Manzek*, the court found that the companies could be found liable when their employee failed to warn schoolchildren that he had recruited to a fundraiser about the risks posed by strangers.[132]  Humphries is not a schoolchild.  Nor is he asking to have been warned.  Instead, he claims that University employees should have been required to protect him, an adult, from school policy-proscribed conduct; and that because those employees failed, he should be able to hold the University and its football coach to account.  That theory is untenable under Pennsylvania law.

"[I]t must be remembered that the concept of duty amounts to no more than 'the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection' from the harm suffered."[133]  Just as Humphries cannot conjure a duty from the school's enactment of policies, he cannot smuggle in that same duty through Penn State and Franklin's supervision of employees that are supposed to enforce the policies.  It is a distinction without a difference and the result is the same:  "simply enacting policies does not create new duties for entities."[134]

---

[132]   *Id.* at 751–52.
[133]   *Althaus*, 756 A.2d at 1168 (quoting William L. Prosser, *Palsgraf Revisited*, 52 Mich. L. Rev. 1, 14–15 (1953)).
[134]   *Humphries*, 492 F. Supp. 3d at 407.

### 3.      Humphries' Special Relationship-Created Duty Theories

Humphries next claims that Penn State and Franklin owed him a duty of care because they had a special relationship.[135]   Pennsylvania law recognizes an exception to the no-duty-to-protect-another rule "if a defendant stands in some special relationship with either the person whose conduct needs to be controlled or in a relationship with the intended victim of the conduct, which gives the intended victim a right to protection."[136]

Humphries puts forward two grounds.   First, he argues that this Court's previous holding—that Pennsylvania law does not recognize a special relationship between a university and its athletes—was mistaken and urges us to reconsider.[137] Second, he contends that by fostering a "unique," "family-like" atmosphere on its football team, Penn State and Franklin created a special relationship through their affirmative conduct and thus owed Humphries a duty.[138]

### a.      *Kleinknecht*—Revisited

Turning first to Humphries argument that Pennsylvania recognizes a special relationship between student-athletes and their schools.   In assessing the motion to dismiss Humphries' previous complaint, this Court reviewed the Pennsylvania Supreme Court's 2019 decision, *Feleccia v. Lackawanna College*, and the Third

---

[135]     Doc. 72-1 at 25–29.
[136]     *Emerich*, 720 A.2d at 1036.
[137]     Doc. 72-1 at 25–27.
[138]     Doc. 72-1 at 27–29.

Circuit's 1993 decision, *Kleinknecht v. Gettysburg College*. As a threshold matter, I noted that these two cases involved a much narrower question: whether colleges owed their athletes a duty to have qualified medical personnel on hand for athletic events. I then found that *Feleccia* was controlling, and that Pennsylvania law did not recognize the special relationship-created duty that Humphries put forward.[139]

Humphries now argues that my analysis missed the mark. He insists that a "close reading" of *Feleccia* shows that the Pennsylvania Supreme Court left *Kleinknecht* undisturbed; that I am compelled to follow *Kleinknecht*, as it is Third Circuit precedent; and that *Kleinknecht* recognized the duty that he has articulated here.[140]

Let's start with Humphries' first two contentions: that in *Feleccia* the Pennsylvania Supreme Court chose not to address whether there is a special relationship between a college and its student-athletes, leaving *Kleinknecht* undisturbed; and that, as a result, this Court should follow this Third Circuit precedent.[141]

In *Feleccia*, the Pennsylvania Supreme Court considered an appeal from a Superior Court decision recognizing that "a college has a duty of care to its intercollegiate student athletes requiring it to have qualified medical personnel at

---

[139]   *Humphries*, 492 F. Supp. 3d at 407–08.
[140]   Doc. 72-1 at 25-27.
[141]   Doc. 72-1 at 25.

athletic events . . . and to provide adequate treatment in the event that an intercollegiate athlete suffers a medical emergency."[142]   The Superior Court's recognition of this duty rested on the Third Circuit's decision in *Kleinknecht*.[143] Much like *Kleinknecht*—a case in which the Third Circuit predicted that the Pennsylvania Supreme Court would have found that the college owed a duty to have medical personnel on hand to tend to an athlete that died from a cardiac event during a school lacrosse practice—*Feleccia* also involved a college sports practice.[144]   In a slight twist, *Feleccia* involved an unlicensed trainer (there were no trainers on hand for the practice in *Kleinknecht*) wrongly telling an athlete that he was okay to return to practice, resulting in his further injury.[145]

The Pennsylvania Supreme Court found that the Superior Court panel erred in relying on *Kleinknecht* to find that the college owed its injured athlete a duty to provide qualified medical personnel at the practice.[146]   The Supreme Court chastised the Superior Court for its reliance on "non-binding federal case law" before launching into the meat of its critique:  the law had changed since *Kleinknecht* was

---

[142]   *Feleccia*, 215 A.3d at 12 (quoting *Feleccia v. Lackawanna College*, 156 A.3d. 1200, 1215 (Pa. Super. 2017)) (internal quotations and alterations omitted).

[143]   *Id.*

[144]   *Id.* at 8-9; *Kleinknecht*, 989 F.2d at 1369.

[145]   *Feleccia*, 215 A.3d at 12.    In total, the case involved two injured players and two unlicensed trainers.  Only one player, Feleccia, was given erroneous medical advice from a trainer; the other player's claim centered on the enforceability of a liability waiver and the coaching staff's negligence—he was injured during the dangerous Oklahoma drill—and did not involve improper medical advice.  *Id.* at 8–12.

[146]   *Id.* at 13.

decided.[147]   Seven years after the Third Circuit's prediction, the Pennsylvania Supreme Court decided *Althaus ex rel. Althaus v. Cohen,* 756 A.2d 1166 (2000), which set forth five factors that courts must analyze before creating a new common law duty of care.[148]   In considering whether Lackawanna College owed its athletes a duty—a new common law duty—the Superior Court had not undertaken an *Althaus* analysis.[149]   And these factors, as the Pennsylvania Supreme Court highlighted in *Feleccia*, are essential; they keep courts within their constitutional bounds and prevent them from straying into "broad-scale policymaking"—a task for which they are ill-suited.[150]   So *Kleinknecht* was not only a non-binding prediction, it was a non-binding prediction that lacked the predicate *Althaus* analysis.

But when faced with this error, rather than applying the *Althaus* factors itself or sending the case back to the Superior Court to do so, the Pennsylvania Supreme Court determined that it need not answer whether to create a new duty because there was (as I delve into in the next section) an alternative existing duty.[151]   And it is on this thin reed that Humphries rests his case:  though the Supreme Court found that

---

[147]   *Id.*

[148]   *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000) ("The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution.").

[149]   *Feleccia*, 215 A.3d at 12–13.

[150]   *Id.* at 13.

[151]   *Id.* at 13–14.

the Superior Court erred in relying on *Kleinknecht*, it didn't decide—one way or the other—whether there was a new, duty-creating special relationship between a college and its athletes; and, in Humphries' view, this means that the Pennsylvania Supreme Court left the Third Circuit's *Kleinknecht* prediction undisturbed.[152]

But Humphries' view glances over essential elements of *Feleccia* and a key federal courts doctrine. It is elementary that "federal courts sitting in diversity cases are required to apply the substantive law of the state whose laws govern the action."[153] A "state's highest court is the best authority on its own law."[154] And when the "the highest state court has recently spoken to the precise question at issue in a particular setting, the duty of the federal . . . is easily met": apply the state law.[155] If, however, "the highest state court has not yet authoritatively addressed the critical issue. . . . [,] such cases must be governed by a prediction of how the state's highest court would decide were it confronted with the problem."[156] Either way, blind adherence to an earlier Circuit Court prediction is unwarranted—and unfaithful to a federal court's task when it is "in effect, sitting as a state court"[157]—if the court

---

[152] Doc. 72-1 at 25–27.

[153] *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 378 (3d Cir. 1990) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

[154] *Comm'n v. Est. of Bosch*, 387 U.S. 456, 465 (1967).

[155] *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 661 (3d Cir. 1980).

[156] *Id.*

[157] *Est. of Bosch*, 387 U.S. at 465.

is "applying state law and there is persuasive evidence that it has undergone a change . . . ."[158]

That the Pennsylvania Supreme Court's decided not to create a new duty in *Feleccia* is, by itself, persuasive enough evidence that the Pennsylvania Supreme Court would not adopt *Kleinknecht*'s special relationship theory if this case were before it.  It had the opportunity; it didn't take it.[159]  But it's not necessary to decipher what the Pennsylvania Supreme Court's decision not to dive into the special relationship waters means—and, in fact, doing so obscures the broader problem with Humphries' assertion that I ought to follow Third Circuit precedent.[160]  In *Feleccia*, the Pennsylvania Supreme Court held that to create a new duty, courts applying Pennsylvania law must employ the *Althaus* factors; when the Superior Court failed to do so, it was a clear error.[161]  *Kleinknecht* did not apply the *Althaus* factors—it predated this change in approach.  And on that basis alone, it is no longer good law.

But even if *Kleinknecht* did provide the basis for my decision, Humphries claim would fail because his third contention falters:  he and the Penn State Defendants did not have the same duty-creating special relationship as the parties in *Kleinknecht*.  The Third Circuit expressly noted that it's holding was "narrow" and

---

[158]   *Roamingwood Sewer & Water Ass'n v. Nat'l Diversified Sales, Inc.*, 509 F. Supp. 3d 198, 209 (M.D. Pa. 2020) (J. Wilson) (quoting *Robinson v. Jiffy Exec. Limousine Co.*, 4 F.3d 237, 240 (3d Cir. 1993))

[159]   *Feleccia*, 215 A.3d at 13–14.

[160]   Doc. 72-1 at 25–27.

[161]   *Feleccia*, 215 A.3d at 12–13.

"predict[ed] only that a court applying Pennsylvania law would conclude that the College had a duty to provide prompt and adequate emergency medical services to . . . its intercollegiate athletes, while [they are] engaged in a school-sponsored athletic activity for which [they] had been recruited."[162]  The duty that Humphries asks us to impose does not fit within this holding.  It is of a different sort and different scope.  It's one thing to require that schools provide adequate medical services to athletes during practices or competition; it's quite another to require that schools guarantee those athletes' safety once they have left the field.  The former is targeted; the latter turns the school and coaches into all-purposes insurers of a particular set of students.[163]

Contrary to Humphries' contention, a close reading of *Feleccia* and *Kleinknecht* do not disturb my previous finding:  "Pennsylvania law does not recognize a special relationship between colleges and student-athletes that would impose a duty of care."[164]  Following *Kleinknecht* would require that this Court greatly expand a now-inapplicable precedent.  This Court cannot do so.  Pennsylvania law has shifted:  to create a new common law duty, courts must apply the *Althaus* factors.  And Humphries has not asked that I create a new duty under *Althaus*.

---

[162]   *Kleinknecht*, 989 F.2d at 1372.
[163]   *See Bradshaw*, 612 F.2d at 138 (3d Cir. 1979) ("[T]he modern American college is not an insurer of the safety of its students.")
[164]   *Humphries*, 492 F. Supp. 3d at 407.

### b. Humphries' Affirmative Conduct-Created Special Relationship Theory

Humphries' second special relationship theory also centers on the student-athlete qualified medical personnel cases.  But his second theory draws, not from *Kleinknecht*, but the alternative duty ground that the Pennsylvania Supreme Court relied on in *Feleccia*—that the college had created a special relationship, and thus undertaken a duty, through its affirmative conduct.  Humphries argues that Lackawanna College's special relationship-creating conduct parallels Penn State and Franklin's conduct here.

Let's return to *Feleccia*.  In finding this alternative special relationship ground, the Pennsylvania Supreme Court applied legal principles from two separate—but related—strands of its jurisprudence where a party's affirmative conduct had created a duty.[165]  It first highlighted *Dittman v. UPMC*—from what I'll call the risk-causing affirmative conduct strand.[166]  This 2018 case considered a claim by hospital employees stemming from a data breach that compromised 62,000 employees personal information, ultimately resulting in many of those employees having false tax returns filed on their behalf.[167]  The employees argued that the hospital owed them a duty to take reasonable care to protect their information from

---

[165]   *Feleccia*, 215 A.3d at 15.
[166]   *Id.* at 14. ("affirmative, risk causing conduct").  *See generally Dittman v. UPMC*, 196 A.3d 1036 (Pa. 2018).
[167]   *Dittman*, 196 A.3d at 1038–39.

the criminal acts of a third party because providing that information to the hospital was a condition of their employment.[168]   To support this assertion, the employees relied on Comment A of the Restatement (Second) of Torts § 302, which provides that "anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act."[169]   The court agreed.   While acknowledging that generally there is not a duty to protect against third-party criminal conduct, it found that the hospital created a special relationship with its employees by requiring that they submit confidential information and that "the data breach was 'within the scope of the risk created' by UPMC."[170]

The second strand of jurisprudence that the Pennsylvania Supreme Court highlighted in finding a duty in *Feleccia* centers on the Restatement (Second) of Torts § 323 and *Feld v. Meriam*.[171]   Unlike the first strand, where the duty turned on the affirmative conduct creating the risk, the second strand rests on what I'll call reliance-inducing affirmative conduct.

As I covered above, section 323 provides that a duty-creating special relationship can be found if a person promises to take on a task that is  "necessary

---

[168]   *Id.* at 1039.

[169]   *Id.* at 1045 (quoting Restatement (Second) of Torts § 302, cmt. a (1965)).

[170]   *Id.* at 1046–48; *see Feleccia*, 215 A.2d at 14 (explaining the *Dittman* holding).

[171]   *Feleccia*, 215 A.3d at 14–15.   *See supra* Section III.A.2 (rejecting Humphries' stand-alone argument that the University's conduct policies and decision to place Parsons on probation created a duty under section 323).

for the protection of the other's person or things . . . ."[172]   But as I noted, the specificity of the promise limits the duty.[173]   In the *Feleccia* court's assessment of whether the college owed its athletes a duty to provide a licensed trainer, it highlighted the application of section 323 in *Feld*.[174]   There, after a husband and wife were victims of a carjacking and abduction in the apartment's parking garage, the court considered a negligence claim by the couple against their landlord.[175] Ordinarily, the court noted, landlords do not owe a duty to protect their tenants from the criminal acts of third parties.[176]   But, in this case, a duty arose because "the landlord undertook to provide secured parking and failed to exercise reasonable care in doing so, and the tenants, who had relied on those services were injured as a result."[177]

With these two strands of caselaw in mind, the Pennsylvania Supreme Court found that Lackawanna College owed its athletes a duty to provide licensed athletic trainers that could treat practice- and competition-related injuries based on its affirmative acts—which both created the risk and induced reliance.[178]   The college had historically provided licensed trainers; it had required that athletes sign an

---

172   Restatement (Second) of Torts § 323.

173   *Jean*, 2021 WL 1516467, at *7.  "For example, a landlord's offer to replace a broke lock constitutes a specific undertaking, but a general promise to provide security on the premises does not." *Id.*

174   *Feleccia*, 215 A.3d at 14–15.

175   *Feld*, 485 A.2d at 746.

176   *Id.* at 746.

177   *Feleccia*, 215 A.3d at 15 (citing *Feld*, 485 A.2d at 746).

178   *Id.* at 16.

agreement giving athletic trainers and other medical professionals permission to treat them; it had continued to hold out the unlicensed trainers (one of whom had given the erroneous medical opinion at issue in the case) as qualified despite knowing that they had failed their exams; and it had allowed the trainer to advise the athlete-plaintiff that he was okay to return to the field and play.[179]  Through this conduct, the court found, the college had "clearly created an expectation" that their athletes "receive treatment from a certified athletic trainer . . . ."[180]  But by instead providing two trainers that had failed their licensing exams, the college had fallen short of this expectation and created the risk of improper treatment that ultimately occurred.[181]

So are Humphries and the *Feleccia* plaintiff similarly situated?  Humphries argues that he has supported his claim that the University Defendants undertook a duty through their affirmative conduct.[182]  He alleges that:

- Franklin promised that the team was a "family" and that he would "defend" team members "as though they were his sons";[183]

- That by accepting a scholarship and playing for the Nittany Lions, team members' athletic, personal, and academic lives are "subject to the significant control" of Penn State and Franklin;[184] and

---

[179] *Id.* at 15–16.
[180] *Id.* at 16.
[181] *Id.* at 8–9.
[182] Doc. 72-1 at 28.
[183] *Id.* at ¶¶ 71–72.
[184] *Id.* at ¶¶ 73–76.

- That the athlete-coach and athlete-Penn State relationship was one of "mutual dependence"—with the University and coaches reliant on players "to generate economic and non-economic benefits" and the players reliant on the University and coaches for continuing access to education.[185]

In total, Humphries argues that the promises, his scholarship, and the parties' mutual dependence created a special relationship.[186]   But Penn State and Franklin's affirmative conduct differs from the duty-creating conduct identified in *Feleccia* and other cases in the Pennsylvania Supreme Court's affirmative duty canon.

To begin with, Humphries does not allege any risk-creating affirmative conduct by Penn State or Franklin.  This separates his case from *Dittman*—where the hospital had required that its employees "provide sensitive personal information and then collected and stored that information on its computer systems . . .";[187]  and from *Feleccia*—where the unlicensed trainer had given the athlete medical advice.[188]

While Humphries does slightly better on the reliance-inducing affirmative conduct front (in the limited sense that he actually alleges reliance-inducing conduct), these alleged promises—that Franklin and his staff would treat Humphries like family and keep him safe—fatally lack specificity.[189]  When the Pennsylvania

---

[185]   *Id.* at ¶¶ 77–80.

[186]   Doc. 72-1 at 28.

[187]   *See Dittman*, 196 A.3d at 1047.

[188]   *Feleccia*, 215 A.3d at 15–16.

[189]   Doc. 58 *Id.* at ¶¶ 71–72; *see Jean*, 2021 WL 1516467, at *7 (highlighting the specificity requirement).

Supreme Court has found a duty based on reliance inducing affirmative conduct, something concrete was promised. Take *Feleccia*: there, the college provided unlicensed trainers despite holding out the trainers as licensed and requiring that athletes sign a medical treatment waiver that said that the trainers would be licensed.[190] And, in *Feld*—where a couple was carjacked and abducted from their apartment parking garage—the court extended a duty because the landlord had provided security guards to maintain the safety of the premises for a fee.[191] Taken as a whole, Humphries has failed to allege risk-creating and reliance-inducing affirmative conduct comparable to *Feleccia* or its forebearers.

But, as I noted above, Humphries also alleges that the University Defendants exercised "control and influence" over athletes athletic, academic, and personal lives;[192] and that the University and its coaches relied on players "to generate economic and non-economic benefits" while the players relied on the University and coaches for access to education.[193] Humphries uses the magic word "rely," but these actions don't fit neatly into the bucket of reliance-inducing affirmative conduct. (And even if they did, there's no allegation that Humphries was harmed because he relied on the University Defendants' promise to continue providing access to education.)

---

[190]   *Feleccia*, 215 A.3d at 15–16.
[191]   *Id.* at 14-15 (citing *Feld*, 485 A.2d at 746).
[192]   Doc. 58 at ¶¶ 73–76.
[193]   *Id.* at ¶¶ 77–80.

I read these allegations as suggesting that Penn State and Franklin had a custodial relationship with Humphries and that, as a result of this control, had created a special relationship.[194]   But Humphries doesn't argue that he falls within the Restatement of Torts (Second) § 314A(4), which provides that a person "who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities of protection is under a similar duty to the other." Though if he had, it's unlikely to have made a difference.  In the four decades since *Bradshaw v. Rawlings*,[195] which ushered out the *in loco parentis* standard on Pennsylvania's college campuses, Pennsylvania courts have consistently held that universities do not "'control' their students' behavior . . . ."[196]  That Humphries was an athlete doesn't tip the scales:  other courts applying the Second Restatement have found that the athlete-college relationship does not make the athlete "a ward of the university without any vestige of free will or independence."[197]   All in all, Humphries' allusions to Penn State and Franklin's control fail to bolster his claim.

---

[194]   This *seems* to be suggested by Humphries citation to paragraphs 69-80 of his third amended complaint in his reply brief.  Doc. 72-1 at 28.  But it is only the Defendant's briefing that makes the case that this is what Humphries is arguing.  Doc. 63 at 14 ("The new wrinkle added by Humphries in the TAC—that the amount of control a university or coach exerts over scholarship student-athletes gives rise to a custodial duty to protect them from harm—does not alter that analysis.").

[195]   612 F.2d 135 (3d Cir. 1979).

[196]   *Millard*, 611 A.2d at 721; *see also Sullivan*, 572 A.2d 1209; *Est. of Fitzpatrick*, 2008 WL 3843078.

[197]   *Orr v. Bringham Young Univ.*, 960 F. Supp. 1522, 1528 (D. Utah 1994), *aff'd*, 108 F.3d 1388 (10th Cir. 1997).

Humphries asks that I impose a far-reaching duty, while failing to offer affirmative conduct on par with *Feleccia*. As a result, this Court predicts that the Pennsylvania Supreme Court would not extend its affirmative-conduct creating special relationship jurisprudence to find a duty based on the facts that Humphries has alleged.

### 4.      Possessor of Land, Special Relationship

Humphries' fourth duty theory rests on another special relationship; this time, the business-invitee relationship.[198]   Drawn from section 314A and 344 of the Restatement (Second) of Torts, this special relationship theory provides yet another exception to the general rule that "there is no duty to control the acts of a third party."[199]   The two restatement provisions work in tandem:  "Section 314A clarifies that the business-invitee relationship is special and thus an exception to the general rule, while section 344 qualifies the exception's scope."[200]

But before Penn State can be found liable under section 344 for negligently failing to protect an invitee—as Humphries argues—two section 314 predicates must be met.[201]   "First the possessor of the land must hold his land 'open to the public.'  And second, the possessor must hold his land open 'for business purposes.'"[202]

---

[198]    Doc. 58 at ¶¶ 282 & 285.

[199]    *Jean*, 2021 WL 1516467, at *5.

[200]    *Id.* at *6.

[201]    *Id.   See* Doc. 58 ¶¶ 282 & 285.

[202]    *Jean*, 2021 WL 1516467, at *6.

The Pennsylvania Supreme Court discussed the rationale behind these section 344 liability predicates in *Feld*, the apartment garage carjacking case covered earlier.[203]   There, the court explained why open invites warrant wider liability: "[P]laces to which the general public are invited . . . are also places where what men can do, they might."[204]   And "one who profits from the very public [he] invites must bear what losses that public may create."[205]   The corollary:  if the invitation is not open, the corresponding burden is unwarranted.

That turned out to be the case in *Feld*.  In finding that the open-to-the-public and open-for-a-business-purpose predicates were not met, the court highlighted that "[t]he common areas of [the] apartment complex [were] not open to the public, nor [were] the general public expected or invited to gather there for other purposes than to visit tenants";[206] quite simply, the "apartment building [was] not a place of public resort . . . ."[207]   As a result, business-invitee liability was unwarranted.[208]

Humphries does not address these predicates.  Instead, his argument addresses only whether Penn State had "actual notice … that [he] was at risk of harm while in the locker room in the Lasch Building . . . ."[209]   In covering this ground, he compares

---

203   *Feld*, 485 A.2d at 745.
204   *Id.*
205   *Id.*
206   *Id.*
207   *Id.*
208   *Id.*
209   Doc. 72-1 at 31.

his case to *James v. Duquesne University*—emphasizing that unlike Duquesne University in that case, which could not have foreseen that students would be shot by a non-student, Penn State had notice because of his reports.[210]  But in charging ahead to Penn State's notice and the foreseeability of the harm—components at the heart of the business-invitee analysis—Humphries glosses over an essential distinction:  the Duquesne University case stemmed from a campus shooting after a dance that was open to the public and where an admission fee was charged.[211]

In contrast, Humphries' pleading does not show that his alleged hazing and harassment occurred in buildings open to the public for business purposes.[212]  He makes no allegation about the Morgan Academic Center (the site of the water pail incident) or Beaver Hall Dormitory (where Yetur Gross-Matos' unspecified conduct occurred).[213]  And his reference to the Lasch building simply parrots the language of the cause of action, asserting that it was "open to the public for entry for its business purposes."[214]  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[215]  And Humphries in no way backs his claim that Penn State has thrown open the doors of its football team's building— or, for that matter, its team locker room and showers—to all-comers.  It is plainly

---

[210]  Doc. 72-1 at 30–31; *see James*, 936 F. Supp. 2d at 646.

[211]  *James*, 936 F. Supp. 2d at 622–23.

[212]  *See* Restatement (Second) of Torts § 344; *Jean*, 2021 WL 1516467, at *6.

[213]  *See* Doc. 58 at ¶¶ 161–163.

[214]  *Id.* at ¶ 17.

[215]  *Iqbal*, 556 U.S. at 678.

"not a place of public resort."[216]  For that reason, imposing a duty under sections 314A and 344 is unwarranted.

### 5.    Negligence *Per Se*

Finally, this Court considers Humphries' negligence *per se* claim against Penn State.  Under Pennsylvania law, the violation of a statute can satisfy the first two elements of a negligence claim:  that the defendant owed and breached a duty.[217] But to do so, the plaintiff must first meet four requirements:

> (1) The purpose of the statute must be . . . to protect the interest of a group of individuals as opposed to the public generally; (2) The statute . . . must clearly apply to the conduct of the defendant; (3) The defendant must violate the statute . . . ; and (4) The violation of the statute must be the proximate cause of the plaintiff's injuries.[218]

Humphries rests his claim on the Piazza Antihazing Law, which makes it a Third Degree misdemeanor for an institution to "intentionally, knowingly, or recklessly promote[] or facilitate[]" hazing.[219]  The parties disagree about whether Humphries has pled facts that meet the third requirement, the violation of the statute.

In the last motion to dismiss, I found that Humphries "had done enough" to proceed with his claim against Penn State for the ten-day period between the Piazza Law's November 18, 2018 enactment and Humphries departure from the University

---

216    *Feld*, 485 A.2d at 745.
217    *Schemberg v. Smicherko*, 85 A.3d 1071, 1074 (Pa. Super. 2014).
218    *Id.*
219    18 Pa. C.S. § 2805.

on November 28.[220]  But an "amended complaint supersedes the original and renders it of no legal effect."[221]  So I consider anew Penn State's motion to dismiss this claim.[222]

For a University to be liable under the Antihazing Law, the plaintiff must first show an underlying violation of the statute.[223]  If that claim is established, then the plaintiff must show that the institution played a part—specifically, that the University "promote[d] or facilitate[d]" the violation.[224]  This Court need not delve into whether Penn State promoted or facilitated hazing, because Humphries revised pleadings fail to allege an underlying hazing violation.[225]

---

[220]   *Humphries*, 492 F. Supp 3d at 404–05.

[221]   *West Run Student Hous. Assocs.*, 712 F.3d 165, 171 (3d Cir. 2013).

[222]   *See id.*

[223]   18 Pa. C.S. § 2805.

[224]   *Id.*

[225]   Though I'd be remiss to say that Humphries hasn't wandered into danger on this front as well.  In a recent decision, this Court delved in the Piazza Law's promotes or facilitates requirement.  *See Jean v. Bucknell University*, 2021 WL 4145055 (M.D. Pa. Sept. 9, 2021).  There, I rejected an argument that I ought to apply the expansive plain meaning of the word "facilitate"—which is, "to make easier".  *Id.* at *7–8.  But in rejecting that plain-meaning definition, I was careful to note that although facilitation generally required some sort of affirmative conduct by an institution or organization, in some instances—like those alleged by Humphries in his previous complaint—a University could "intentional, knowingly, or recklessly" facilitate hazing if it "ignored the plaintiff's reports of hazing in a way that resulted in future hazing."  *Id.* at *8.  While in his previous complaint Humphries alleged that the University took "no substantive action" in response to his reports, *Humphries*, 492 F. Supp. 3d at 401 (citing Doc. 40 at ¶¶ 105-106), in his third amended complaint he now argues that Penn State "stood idle taking no *effective* action" and details the University's decision to place Micah Parsons on probation in the aftermath of the March fight.  Doc. 72-1 at 2 (emphasis added); Doc. 58 at ¶¶ 179(2)-193(2).  These new assertions undercut his argument that, through its inaction, Penn State facilitated hazing.

- 47 -

The bounds of this underlying hazing violation are marked by Section 2802, which includes in its pertinent part:

> A person commits the offense of hazing if the person intentionally, knowingly or recklessly, for the purpose of initiating, admitting or affiliating a minor or student into or with an organization, or for the purpose of continuing or enhancing a minor or student's membership or status in an organization, causes, coerces or forces a minor or student to . . . . [e]ndure brutality of a physical nature, . . . . mental nature, . . . . [or] sexual nature . . . .[226]

In effect, there are two requirements to a predicate section 2802 claim: plaintiffs must show both hazing conduct (the brutality) and a hazing purpose (initiation, admission, affiliation, continuance, or enhancement).

Humphries has adequately alleged that he was forced to endure physical, mental, and sexual brutality—meeting the conduct requirement.[227] Penn State, however, argues that Humphries has failed to show that the purpose of his abuse was initiation—the hazing purpose that he has pled.[228]

By its very terms, the hazing statute does not extend to every act of abuse or violence at a college; enduring abuse while a student, or even while a member of a

---

[226] 18 Pa. C.S. § 2802.

[227] Doc. 58 at ¶¶ 144–159.

[228] In each of his four complaints, Humphries has alleged that the harassment he endured was a part of his "initiation". Complaint Doc. 1 at ¶ 77 (Complaint); Doc. 22. at ¶ 77 (First Amended Complaint); Doc. 40 at ¶ 83 (Second Amended Complaint); Doc. 58 at ¶ 58 (Third Amended Complaint). While he correctly notes that the Piazza Law is not limited solely to initiation and argues that he can show that hazing was part of continuing or enhancing Humphries' status on the team, he cannot modify his pleading and assert a new theory in his reply brief.

team—however heinous—does not suffice.[229]  To come within the Antihazing Law, Humphries must show that these four players' abuse was "for the purpose of initiating" him onto the team.[230]

But Humphries' pleadings do not show that the abuse he suffered was a requirement to be on the team.  In fact, his complaint makes the case for its own dismissal.  To begin with, Humphries alleges that he was retaliated against by the four players, "in a concerted effort to ostracize and isolate [him] from . . . the football team."[231]  In the next paragraph, he doubles down on this allegation, arguing that beyond isolating him, the players tried "to create a hostile environment intended to encourage [him] to voluntarily withdraw from Pennsylvania State University and resign himself from its football program."[232]  Far from showing that the players intended to initiate him, Humphries complaint shows that these players intended to drive him from the team.

If this fatal admission wasn't enough, Humphries also fails to explain how he was initiated by two athletes who enrolled at the same time as him, and two others who were just a semester ahead.  This Court does not adopt a rule that a person cannot be initiated by a younger or less experienced person; they too can be hazers.  Still, the plaintiff must allege that the party polices—formally, or not—the

---

[229]  *See* 18 Pa. C.S. § 2802.
[230]  *Id.*
[231]  Doc. 58 at ¶ 194.
[232]  *Id.* at ¶ 195.

organization's membership.  In his previous complaint, Humphries alleged that he "viewed [Barber, Parsons, and Luketa] as upper classmen or in leadership positions" and that "Parsons was a member of the Penn State football team's leadership council."[233]   Those references vanished in his latest complaint—with nothing alleging a similar sort of power structure in their place.  Perhaps recognizing his error, Humphries raises for the first time in his reply brief that the hazing "established a hierarchy of status . . . ."[234]  But a reply brief is no place to amend a complaint.

And, finally, Humphries fails to show how his ongoing abuse constituted initiation during the ten-day period in which he can plead a claim under the Antihazing Law.  Even if this Court accept his pleading that the host of abuses he suffered happened two- to three-times a week throughout his stint—the latest of the three incidents that he identifies with any specificity occurred in June—he does not support his claim that in his tenth month on the squad, this abuse was intended to initiate him.

A host of criminal and civil laws proscribe the abuse that Humphries suffered at Penn State; but the Piazza Antihazing Law proscribes this behavior only when it is done "for the purpose of initiating, admitting, or affiliating."[235]   Humphries'

---

[233]   Doc. 40 at ¶¶ 80 & 81.  The previous complaint did not include Yetur Gross-Matos in this paragraph's hazing allegation.

[234]   Doc. 72-1 at 19.

[235]   18 Pa. C.S. § 2802.

allegations fail to show a hazing purpose, and on this basis alone his claim against Penn State fails.

*     *     *

None of Humphries five theories show that Penn State or Franklin owed a duty to protect him.  As a result, Count II (negligence *per se* against Penn State), Count IV (negligence against Penn State), and Count V (negligence against Franklin) are dismissed with prejudice.

### B.   Humphries' Negligent Infliction of Emotional Distress Claim Fails

Next, I consider Count VIII and whether Humphries has stated a claim for negligent infliction of emotional distress (NIED) against Penn State and Franklin.[236] The Pennsylvania law that underlies this claim is unsettled.[237]  What's clear:  to succeed on this claim, Humphries "must establish a prima facie case of negligence."[238]  He has not done so here.  But even if he had a bona fide negligence claim, his claim would still flounder under a generous reading of the unsettled NIED case law.

---

[236]   Humphries pleads this claim against all Defendants; but, here, I consider only whether this claim has been adequately pled against Penn State and Franklin.

[237]   *See Toney v. Chester Cnty. Hosp.*, 36 A.3d 83 (Pa. 2011).

[238]   *Humphries*, 492 F. Supp. 3d at 409.

### 1.    *Toney* is persuasive authority

In Pennsylvania, the tort of negligent infliction of emotional distress has evolved over the last half-century.[239]  But this evolution has been limited—owing to courts' historical aversion to compensating plaintiffs for emotional harm.  Like many other state supreme courts, the Pennsylvania Supreme Court has expressed concern that a broad right to recover for negligently inflicted emotional harm would result in a "flood of litigation" where it would be difficult is to ferret out fraudulent or frivolous claims from genuine ones.[240]  And their concern didn't stop there:  even when faced with genuine claims, they asked, how would courts be able to give the claim the proper price tag?[241]  Thus, while the theory behind the cause of action is to allow plaintiffs to recover for foreseeable emotional harms caused by a defendant's negligence, in reality, the right to recover has been limited to a few narrow categories.[242]

The parties agree on three of those categories.  That is, plaintiffs can recover damages for negligently caused emotional distress (1) when "the plaintiff suffers a physical injury which causes the emotional distress";[243] (2) when the plaintiff was in the "zone of danger"—or, in other words, experienced a "near-miss" and suffered

---

[239]   *Toney*, 36 A.3d at 88–89.

[240]   *Id.* at 88.

[241]   *Id.* at 88.

[242]   *See id.* at 88–89.

[243]   *Hershman v. Muhlenberg Coll.*, 17 F. Supp. 3d 454, 459 (E.D. Pa. 2014) (citing *Kazatsky v. King David Mem'l Park Inc.*, 527 A.2d 988, 992 (Pa. 1987)).

emotional distress from having been endangered, despite not having suffered physical harm;[244] and (3) when the "plaintiff witnesses an accident causing serious injury to a close family member."[245]  The parties disagree, however, as to whether there is a fourth category—and for good reason.

Humphries argues that in *Toney v. Chester County Hospital*, the Pennsylvania Supreme Court recognized a new NIED category that would allow plaintiffs to recover for negligently inflicted emotional harms "where a special relationship existed and where it was foreseeable [that there was] a potential for deep emotional harm to result in the event of a breach . . . ."[246]  The University Defendants' response: it did not.[247]  And the Defendants get it right—for the most part.

Penn State and Franklin correctly point out that "the *Toney* Court was evenly divided" and "the opinion was in support of affirmance, and not the Opinion of the Court."[248]  They are also correct that "[f]or that reason, the *Toney* decision . . . 'lacks precedential value.'"[249]  But the non-precedential nature of the *Toney* affirmance does not necessarily mean, as they say, that "Pennsylvania law *limits* NIED claims to three situations."[250]  Rather, *Toney* remains a persuasive authority on whether I

---

[244]   *Id.* (citing *Niederman v. Brodsky*, 261 A.2d 84 (Pa. 1970)).
[245]   *Id.* (citing *Sinn v. Burd*, 404 A.2d 672 (1979).
[246]   Doc. 72-1 at 39.
[247]   Doc. 73 at 18.
[248]   *Id.* (quoting *MDB v. Punxsutawney Christian Sch.*, 386 F. Supp. 3d 565, 593 (W.D. Pa. 2019)) (internal quotations omitted).
[249]   *Id.* (quoting *MDB*, 386 F. Supp. at 593).
[250]   *Id.* at 17 (emphasis added).

would predict that the Pennsylvania Supreme Court would recognize a special relationship NIED claim in the future.[251]  Indeed, "[i]t is a close question whether the Pennsylvania Supreme Court will ever rule that a claim for NIED may be based on a breach of a special relationship . . . ."[252]  Thankfully, guessing at how a court that divided evenly on the question previously would answer that question moving forward is not required:  as Penn State and Franklin put it, "Humphries fails to invoke *Toney*—even on *Toney's* own terms . . . ."[253]

### 2. The special relationship that Humphries alleges would not be recognized if *Toney* were controlling

I need not predict how the Pennsylvania Supreme Court would decide that close question because, in *Toney*, the justices writing to affirm the lower court's special relationship theory made plain that if the court did recognize the claim, not every special relationship accepted in a negligence claim would meet its NIED standard.[254] And if Humphries' purported special relationship were cognizable, it would not meet this heightened NIED standard.

Humphries argues that he has established that he had a special relationship with Penn State and Franklin that would give rise to NIED liability.[255]  He points first to his status as a recruited athlete, which he argues creates a special relationship

---

251  *MDB*, 386 F. Supp. at 593
252  *Hershman*, 17 F. Supp. 3d at 460.
253  Doc. 73 at 18.
254  *See Toney*, 36 A.3d at 95.
255  Doc. 72-1 at 38–39.

under *Kleinknecht*.[256]   And he also references the Defendants' duty-creating affirmative conduct, which he posits establishes a special relationship under *Feleccia*.[257]   Earlier, in assessing Humphries' negligence claim, I rejected both theories.   But even if they had merit, those special relationship wouldn't be controlling here.   Humphries confuses the law on this point.   There's a distinction between duty-creating special relationships under negligence law and special relationships in an NIED claim.[258]

The standard for the latter is far more stringent.   In *Toney*, the affirming justices carefully limited the prospective NIED claim's reach.   To qualify, they wrote, "special relationships must encompass an implied duty to care for the plaintiff's emotion well-being."[259]   They also added that no implied duty arises if the relationship does not "obviously and objectively hold the potential for deep emotional harm in the event of breach."[260]

So what sort of special relationships hold the seeds of this sort of harm?   In *Toney*, the court declined to create an exhaustive list.   But its survey of existing caselaw suggests that there are few.[261]

---

[256]   *Id.*
[257]   *Id.* at 39.
[258]   *See Toney*, 36 A.3d at 90–95.
[259]   *Id.*
[260]   *Id.*
[261]   *See id.* at 92–95.

The quintessential example is the botched burial.[262]  Courts far and wide have recognized that "the relationship between the loved ones of the deceased and those responsible for caring for the corpse" contains obvious and objective potential for harm.[263]  Besides matters of death, *Toney* also recognized this potential in matters of life—specifically, those involving the birth of a child.[264]  But even there, caution is warranted.  That was the issue considered in *Toney*—and the Pennsylvania Supreme Court only had enough votes to affirm the Superior Court's finding that the obstetrician-expectant mother relationship "implied [a] duty to care for the plaintiff's emotional well-being."[265]

Given the narrow scope of this not-quite recognized NIED liability ground, it should come as no surprise that courts in this state have found that "the relationship between a college and its students does not hold the potential of deep emotional harm."[266]  That Humphries played a sport for his college does not alter the calculus. Whether through a benching or a tragic loss, heartache is certain to accompany college sports, but it poses no greater obvious and objective "potential for deep

---

[262]  *See id.* at 92–94.
[263]  *Id.* at 92.
[264]  *Id.* at 93–94.  *See also Madison v. Bethanna*, 2012 WL 1867459 (E.D. Pa. May 23, 2012) (refusing to dismiss an NIED claim alleging a special relationship between adoptive parents and an adoption agency).
[265]  *Toney*, 36 A.3d at 95.
[266]  *Hershman*, 17 F. Supp. 3d at 460.  *See also Kling v. Pittsburgh Med. Ctr.*, 2020 WL 2832008, at *4 (W.D. Pa. May 8, 2020) (finding that the college-student relationship does not support an NIED claim); *Walsh v. Univ. of Pittsburgh*, 2015 WL 128104, at *15-16 (W.D. Pa. Jan. 8, 2015) (same).

emotional harm" to a student than the ordinary college experience.  That is not to say that deep emotional harms do not afflict college students or athletes—it's simply that having experienced deep emotional harm is not the standard.[267]

In marking the bounds of NIED law, the Pennsylvania Supreme Court wanted to make sure that the harm they were compensating was genuine; and limiting the extension of compensation to a narrow group of relationships that "obviously and objectively hold the potential for deep emotional harm" was their solution.[268]  The relationship between a university and its students does not qualify, neither does the relationship between athletes and their universities, nor the relationship between athletes and their coaches.[269]  So even if the athlete-coach or athlete-university relationship met the special relationship standard under Pennsylvania negligence law, those relationships would still not support an NIED claim.[270]

The flaws in Humphries' NIED claim against Penn State and Franklin are numerous—and fatal:  he lacks a predicate negligence claim; the case on which he rests his theory of recovery is merely persuasive authority; and even if that case were binding, his theory of a special relationship—which I rejected already—is not the

---

[267]   *See Toney*, 36 A.3d at 94 (quoting *Larsen v. Banner Health Sys.*, 81 P.3d 196, 200) (positively referencing a Wyoming court decision highlighting that not even every medical relationship holds deep potential for emotional harm because "[a]lthough some level of emotion attends every situation involving one's health, we do not anticipate that every area of healthcare will carry the deploy emotional responses sufficient to sustain this exception.")

[268]   *See id.* at 90–95.

[269]   *Id.* at 95.  *See also Hershman*, 17 F. Supp. 3d at 460.

[270]   *Toney*, 36 A.3d at 95.

sort that would give rise to liability anyway.  Accordingly, Count VIII, as it pertains to Penn State and Franklin, is dismissed with prejudice.

### C.     Humphries Fails to State a Claim Under Title IX

Finally, I consider Count I, Humphries' federal law claim against Penn State for violating Title IX of the Education Amendments of 1972.  In resolving the motion to dismiss Humphries' previous complaint, I found that Humphries had not alleged facts sufficient to support a Title IX harassment claim or retaliation claim.  I ruled that Humphries had not established that he was harassed because of sex, which doomed his first theory; and that Humphries had not alleged that Penn State retaliated against him for reporting any sex discrimination, which doomed his second.

Humphries sticks to these theories in his latest complaint; but his revised pleadings glance over my red ink and fail to cure the defects I identified in his previous complaint.  Thus, his claim is dismissed yet again, but this time with prejudice.

#### 1.     Humphries was not harassed because of his sex

Title IX states in part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal

financial assistance."[271]   The Supreme Court has recognized that Title IX permits

hostile educational environment claims based on student-on-student harassment.[272]

To succeed under this theory, a plaintiff must show that:

> (1) the defendant received federal funds; (2) sexual harassment
> occurred; (3) the harassment took place under circumstances wherein
> the funding recipient exercised substantial control over both the
> harasser and the context in which the harassment occurred; (4) the
> funding recipient had actual knowledge of the harassment; (5) the
> funding recipient was deliberately indifferent to the harassment; and (6)
> the harassment was so severe, pervasive, and objectively offensive that
> it could be said to have deprived the victims of access to the educational
> opportunities or benefits provided by the school.[273]

In a student-on-student sexual harassment case, plaintiffs have at least three avenues.

They can show that "the harasser was motivated by sexual desire, [that] the harasser

was expressing a general hostility to the presence of one sex in the workplace, or

[that] the harasser was acting to punish the victim's noncompliance with gender

stereotypes."[274]   It is that last theory that Humphries attempts and fails to plead here.

Humphries' doesn't clearly assert his gender stereotype claim, but it's

arguably premised on at least two different theories.   First, he claims that he was

harassed as some type of initiation into the Penn State football team.   Alternatively,

he suggests that he was harassed because he "presented as elegant, dignified, and

---

[271]   20 U.S.C. § 1681 (a).

[272]   *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 & 650 (1999).

[273]   *Dawn L. v. Greater Johnstown Sch. Dist.*, 586 F. Supp. 2d 332 (W.D. Pa. 2008) (citing *Davis*, 526 U.S. at 650-52 (1999)).

[274]   *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 264 (3d Cir. 2000).

[was] perceived of [as being from a] high social class."[275]   But Humphries fails to explain how this initiation theory equates to discrimination because of sex, and he never clarifies how elegance, dignity, or social standing is particularly feminine, or unmasculine.

Harassment as a form of initiation into an organization is otherwise known as hazing, a claim that I addressed earlier.  But that rationale—initiation—has nothing to do with sex.  As I explained in my previous memorandum opinion, Humphries cannot sustain a Title IX claim on that theory.[276]

In his briefing, Humphries focuses on his second theory:  that he was harassed by his teammates because he "failed to live up to the expectations of stereotypical toughness and masculinity expected *of a collegiate football player*."[277]   That conclusion is distinct from a claim that Humphries was harassed because he failed to live up to his teammates' expectations of the stereotypical toughness and masculinity expected *of a man*.  His claims fail because none of the harassment-causing traits that he identifies are unmasculine or effeminate.  Being elegant is not inherently or especially feminine.  Being dignified is not found more often in men or women.  And being high-class has little—if anything—to do with one's sex.

---

[275]   Doc. 72-1 at 4.
[276]   *Humphries*, 492 F. Supp. At 402–03.
[277]   Doc. 58 at ¶ 139 (emphasis added).

The cases Humphries cites for support are easily distinguishable.  In one, *Doe v. Southeastern Green School District*, a twelve-year-old boy was outed as being gay and bullied by students who targeted him because of his sexuality.[278]  The court in that case noted the plaintiff's theory was that he "did not conform to the gender stereotype of a middle school male."[279]  Failing to conform to the stereotype of a sex (male) is different from failing to conform to the stereotypes expected in a particular activity (football).

Another case Humphries relies on, *Doe by Doe v. City of Belleville, Illinois*, is distinct because once again, the plaintiff in that action was targeted because of something perceived to be feminine.[280]  Putting aside the fact that the decision was vacated, it simply does not help Humphries state his claim.  In that case, one of the plaintiffs was harassed by his coworkers.  The court noted that the record suggested that this plaintiff was harassed "in whole or in part because he wore an earring, a fact that evidently suggested to his co-workers that he was a 'girl' or, in their more vulgar view, a 'bitch.'"[281]  Wearing earrings may have been (and may very well still be) considered effeminate, such that it could support the causal finding for a sexual harassment claim.  But that is, again, different in kind from elegance or dignity or

---

[278]    2006 WL 8458032 (W.D. Pa. Mar. 24, 2006).
[279]    *Id.* at *6.
[280]    119 F.3d 563 (7th Cir. 1997).
[281]    *Id.*

social class or the diction with which one speaks.  None of those traits are inherently masculine.

Humphries' claim fails not because the allegations he makes could never support a claim for sexual harassment, but because he never ties his abuse and harassment to a gender stereotype.  His initiation theory does not support a finding that he was harassed because of sex.  And his theory that he "failed to live up to the expectations of stereotypical toughness and masculinity expected *of a collegiate football player*" all but dooms his claim.[282]

If Humphries had alleged that he failed to live up to the expectations of stereotypical toughness and masculinity expected of an eighteen- to twenty-two-year-old male, he may well have survived the motion to dismiss.  But Humphries willingly took his claim out of the sphere of sex and into the sphere of an activity. Humphries tries to bring his claim back under the umbrella of sex in his brief by alleging that Penn State "expected the plaintiff to toughen up, stop acting like a 'girl', stand up and fist-fight to defend himself, and not run to authority."[283]  But as the University Defendants correctly note, none of the words "girl," "feminine," or "woman" are even in his latest complaint; nor does anything else in it support that claim.  As I noted above, a reply brief is no place to amend a complaint's factual deficiencies.

---

[282]   Doc. 58 at ¶ 139 (emphasis added).
[283]   Doc. 72-1 at 8.

As the United States Court of Appeals for the Sixth Circuit recently noted while affirming the dismissal of a Title IX claim, toughness is not a gendered trait:

> [W]hile sometimes celebrated in men, [toughness] is certainly not discouraged in women, especially in a professional or team setting. Indeed, in sports, law enforcement, business, law, politics, the armed services, and myriad other activities and professions, women are called upon to be as tough as men.  And in many instances, women outpace their male colleagues in that respect.[284]

Although the Sixth Circuit recognized that the insults hurled by the football coach in that case had sexual connotations and were arguably an attack on the plaintiff's masculinity, it recognized that the coach's comments "targeted a fundamental requirement for football players—toughness."[285]  That is exactly what Humphries claims caused his teammates to harass him.

Humphries pled himself out of a Title IX claim by narrowing his pool to collegiate football players.[286]

### 2.     Humphries was not retaliated against for reporting any alleged harassment

Humphries' retaliation claim against Penn State is even less-clearly pled.  But the crux of his claim is that Franklin and other coaches retaliated against him for reporting the alleged harassment.  To state a claim for retaliation under Title IX, a plaintiff must allege: "(1) that he or she engaged in protected activity; (2) [the]

---

[284]   *Chisholm v. St. Mary's City Sch. Dist. Bd. of Ed.*, 947 F.3d 342, 352 (6th Cir. 2020).

[285]   *Id.*

[286]   Although Penn State identified its argument plainly in its opening brief, Humphries made no attempt to address the issues raised or the cases highlighted.

defendant had knowledge of the protected activity; (3) adverse school-related action was taken against plaintiff; and (4) a causal connection between the protected activity and the adverse action."[287]   At the outset, Humphries fails to address the necessary elements of a Title IX claim.   Instead, Humphries tries to conflate the elements of a Title IX harassment claim with those of a Title IX retaliation claim.[288] That decision foreshadows the result.

Humphries claims that because he reported harassment, he was retaliated against by his coaches.   The allegations plausibly pled are that the coaches: (1) "overly and unfairly scrutinized" his athletic performance; (2) "scorned" him;[289] (3) required him to participate in drills designed to ensure his failure; (4) subjected him to "irrational and inappropriate censure";[290] (5) denied him necessary medical accommodations; (6) tried to push him into medical retirement; and (7) spoke poorly of him to other football coaches after he decided to transfer.[291]

Humphries fails to engage, even on a surface level, with causation.   He does not plainly state whether he is alleging direct or indirect evidence of causation— making that determination far harder than it needed to be.   It appears that Humphries'

---

[287]   *S.K. v. North Allegheny Sch. Dist.*, 168 F. Supp. 3d 786, 803-04 (W.D. Pa. 2016) (citing *Yan v. Pennsylvania State Univ.*, 529 Fed. App'x 167, 171 (3d Cir. 2013)).

[288]   Specifically, Humphries attempts to shoehorn his entire retaliation claim into the "deliberate indifference" element of the Title IX harassment claim, without any explanation whatsoever.

[289]   It is impossible to deduce what scorning someone looks like in this context.

[290]   The meaning of censure in this context also escapes the Court.

[291]   Doc. 58 at ¶ 187.

claim more readily relies on indirect evidence. "A Title IX plaintiff may demonstrate causation in three ways: (1) by way of temporal proximity between the adverse action and the protected activity, (2) by showing a pattern of animus after the protected activity; or (3) by other circumstantial evidence concerning the school's motivation, including inconsistent reasons given by the school or its treatment of others."[292]

Once again, despite being directed to do so, Humphries chose not to detail the timeline of events. He provides only three specific dates on which he allegedly informed Penn State football coaches about some sort of harassment. But even then, he never provides information about when the alleged retaliation began or how often it took place. So he cannot show any temporal proximity that would show causation. Likewise, his imprecise pleading prevents him from establishing a pattern of animus after the protected activity. And Humphries fails to point to any other circumstantial evidence about the school's motivation for this alleged retaliation.

Instead, the only time he provides any details, he undermines his own claim. For example, Humphries alleges that he got into a fight with Micah Parsons after Parsons doused him with a pail of water; things escalated from there and ended with Humphries brandishing a knife to fend Parsons off.[293] Humphries reported the

---

[292] *Doe v. Manor Coll.*, 479 F. Supp. 3d 151, 172 (E.D. Pa. 2020) (citing *Atkinson v. Lafayette Coll.*, 653 F. Supp. 2d 581 (E.D. Pa. 2009)) (internal quotation marks omitted).

[293] Doc. 58 at ¶¶ 179(2)–183(2).

incident to the coaching staff and two days later Franklin gave him extra workouts as punishment for pulling a knife on a teammate rather than fight without a weapon.[294]   Humphries claims this is retaliatory behavior.[295]

Even if this behavior were retaliatory, Humphries himself tells the Court that this alleged retaliation had nothing to do with any protected activity under Title IX. Instead, in both his complaint and briefing, Humphries claims that "Franklin retaliated against [him] *for defending himself by brandishing a knife* and not fist-fighting Micah Parsons man-to-man"—not for complaining about sexual harassment.[296]   Humphries' latest complaint falls well short of plausibly pleading a claim of retaliation, mainly because Humphries' failure to adequately establish the series of events—again, despite this Court's instruction.   As a result, he has not alleged causation, even under the liberal pleading standards of the Federal Rules.

Thus, the University Defendants' motion to dismiss Humphries' Title IX claim is granted.

---

294   *Id.* at ¶¶ 185(2)–192.
295   *Id.* at ¶ 222(h).
296   Doc. 72-1 at 8 (emphasis added).   *See also* Doc. 58 at ¶ 192 ("James Franklin imposed punishment upon the plaintiff in the form of additional work-outs dubbed 'dawn patrol' as a result of the plaintiff having chosen to brandish a knife to ward off Micah Parsons rather than having chosen to fist-fight Micah Parsons.").

## IV.   CONCLUSION

Humphries' latest complaint must be his last complaint.  He's had four tries. If he could have alleged facts to support his various claims, he would have done so by now.  I therefore find that further amendment would be futile and that it would be improper to require Penn State and Franklin to defend against these claims yet again.  Penn State and Franklin's motion to dismiss Count I, Count II, Count IV, Count V, and Count VIII with prejudice is granted.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge